Good morning, Your Honor. May it please the Court, my name is Jason Taylor, and I represent Plaintiff Appellant Double Eagle Alloys, also known as DEA. The dispute at the heart of this case is precisely why state and federal trade secret laws were enacted. This is a hired, trained, and imposed trust in certain employees. These employees later abused that trust by using the information that they learned while employed at Double Eagle to unfairly compete against the company. Specifically, this is a case about how Double Eagle's inside sales manager, Michael Hooper, over a series of months conspired with defendant Ace to misappropriate DEA's most sensitive customer information. They did that in order to enter into the highly competitive pump shaft quality known as PSQ metals industry. It's a case about how in the weeks leading up to Hooper's formal resignation, he secretly downloaded 2,600 files of DEA's most sensitive information. That has been known, in this case, as the large download. Amongst that download was DEA's PSQ specifications, customer drawings, and pricing information. The specifications are the specifications that you gave to TC, correct? Not the specifications that were given to you. I think you might be confusing customer drawings with specifications. No, I'm not. So with the specifications, I understand that you gave to your machining company a cumulative list of the alloys, the proprietary ranges, and when you refer to your DEA's specifications, that's what you're referring to. That's correct. Then the final, and then pricing information. Within that pricing information is detailed quotes, cost sheets, and margin information. These are the trade secrets at issue in this case. When Mr. Hooper left DEA and joined ACE immediately, within two days of working at ACE, he took that flash drive that contained that March download, plugged it into the ACE computer, and uploaded it to their cloud system. Then that uploaded the entire March download into ACE's database. Was the entire March download trade secret? Not entirely. Most of it. That's the district court's problem with your case. As the court put it, you never separated the wheat from the chaff. From your answer there, I'm gathering that you're thinking it's almost all wheat and maybe some insignificant chaff. It is almost all wheat and insignificant chaff. But it's not explained to the district court why that is. It's just given, you just gave broad categories of information, and the district court said, not my job to sort through this voluminous record and determine what are trade secrets or not. It seems reasonable. Tell me why not. Well, Your Honor, with respect to the district court, we obviously disagree with that position. The March download contained the universe of documents that were misappropriated. Within the March download, we identified by category the specific documents that comprise our trade secrets. But there are differences amongst the whole collection of the download as far as which are treated confidentially, which have already been released, which... There is, and that's why you have to look at each of them separately and individually. You being the district court, up to the district court to do that, or it's up to you to explain? The appropriate standard is we have to identify the trade secrets with reasonable definiteness in which the fact finder and the defendant can understand what the trade secret is. And in the Tenth Circuit, there's not a bright line test or rule about what language needs to be used to do that. So you need to look at them individually. Unfortunately, we don't contend that the district court utilized that standard. We believe that the district court had a higher standard on what, with respect to how you identify a trade secret. And so, with respect to whether we sufficiently... And what was the district court's higher standard? The district court, in his order, said that the plaintiff must describe boundaries of trade secrets in a manner that would permit, one, to understand whether trade secret protection is claimed with respect to individual files or a combination thereof, evaluate whether the information in whole or combination is publicly available, and three, enroll on motions in limine and evidentiary standards. Isn't that black letter law? It's not, Your Honor. The Tenth Circuit says, as far as identification, you just have to identify it with sufficient definiteness in which the fact finder and the defendant understand what's at issue. Well, let me ask it this way. Other cases say that too, don't they? I'm sorry, Your Honor. Other cases say the same thing. About? As far as the reason for having to identify particularly, is for those reasons so that you can evaluate, is this a trade secret? Well, it's almost a two-step process, Your Honor. You need to identify it with sufficient particularity so the defendant and the fact finder knows what's at issue, and then you have to evaluate the trade secret itself. And we have a problem with the standard that Judge Russell employed there as well, because that standard was a higher standard. In fact, he was going to a standard of hyper-focus on secrecy, how much of this stuff had been leaked out in one form or fashion, and that's not the standard. The standard is what reasonable measures were taken to protect the trade secrets. So the focus is on what steps did the trade secret holder employ to keep those secrets safe. It's not dispositive whether anything in particular ever was disclosed. That's not the analysis. But we have to know what specifically the trade secrets are talking about. Correct. In our contentions, when you look at each of the trade secrets individually, we did accurately describe it. When you look at them individually, let's take the first one that Judge Bacharach identified, specifications. There are a limited number of specifications in the March 22 download. We attached to our summary judgment briefing the actual specifications for two of the alloys at issue. So we've identified them. That's not a general category. Those are the specifications. Also relevant in the case law is whether the defendant understands what the information is. The defendant has a competing business that employs and utilizes those specifications. There is no confusion about what specifications are and whether we are containing their trade secrets. The second category is custom. Before you get to the second category on the specifications, let's just assume for the sake of argument that it is highly confidential of what value are DEA's specifications to TC to any other competitor like Ace or any other company. Because as I understand your explanation of the specifications, it's the sum total of all of the products that Double Eagle needs to fill your orders. Any other competitor, Ace, any other competitor is going to have a variety of customers. Some may be buying from the same customer base that you have. Some may be different. Their proprietary ranges may be different. So how would it be of any economic value or even to save a step for Ace or any other supplier just to know what DEA's specifications are? The value is that this equipment is very expensive and there are very long lead times to acquire it. So if you have specifications which can only be garnered by developing a large customer base, you can buy more efficiently in economies of scale. In other words, if you know the range where you buy certain alloys with certain properties, you can then buy it in advance, inventory it, and know that when that next sale comes along, you have product that will satisfy your various customer specifications. But why would Ace care, unless they want to buy up all of the 718s so that DEA can't fulfill its customers. Is that what you're saying? Well, no, your honor. Well, except for the buying up and monopolizing the market, I still don't understand why Ace would care what the sum total of your products are. Because they were a new competitor into that market, and so they didn't have PSQ customers in which to gather all that information. If they use our specifications, they can order to those specs, and there's evidence that they ordered to our spec, the DEA spec, so that allows them to basically jumpstart themselves into the market. Didn't Ace already have specifications a year before? Part of our contention is that, remember in the record, there's a lot of crossover between our employees and theirs, and that the language in their specification is identical to ours. One of our contentions is that that information is actually our information that they've utilized for themselves. Is there a meaningful difference between your specifications, their specifications, Baker Hughes' specifications? There's a meaningful difference. Baker Hughes is a customer. That's their own specification. We will use Baker Hughes and all the other customers to compile the DEA specification. So that's the value of ours, is that we're collecting all of the different customers, Baker Hughes being an important one, but theirs is only for their particular use. Ours is broader than that. The difference between ours and theirs is that they use ours. Our contention is they didn't go through the cost and expense of developing this customer base. They just used our information and are benefiting it without incurring the cost. You claim in your opening brief that, quote, the district court failed to give Double Eagle an adequate opportunity to fully present its evidence in support of its claim. If that's what you thought, why didn't you introduce new evidence when the district court gave that opportunity when you asked for supplemental briefs instead? That's a fair question. The court wanted us to respond based on what was in the record. They said we could ask for leave. It's not certain that we would get it, but that we could ask for leave. We believe that what's in the record, when you actually look at each one of those categories, those three categories, was sufficient when the actual standards were identified. Our contention with the failing to the district court is they essentially acted as the jury in this case by using a higher standard for both identification and the evaluation of the trade secret to go to the ultimate issue. I'm starting to run low on time, but when the court was so focused on the secrecy and pointing to different points about whether something had become public or not, that's not the analysis about whether there's a dispute of fact as to the trade secret. It's whether reasonable measures were taken and whether it was readily ascertainable. When you apply those standards in the relevant case law, we feel like Judge Russell overreached on the determination. Judge Phillips, I think you had a question. No further questions? Robert, why don't you stop this clock? I just had a question about the pricing specifications. On appeal, or the pricing information, on appeal you said that your cost to TC and your target margins were highly confidential. I didn't see anything like that in your briefing in district court. The district court, presumably, would be reasonable based on what was presented to Judge Russell in saying that you certainly identified a number of things that go into your pricing, but not necessarily identifying any of those components that were confidential when you presented to us. We certainly have the benefit of your argument about which of those components are confidential, i.e. your cost and your target margins. How do you respond to that? I believe we submitted testimony from our sales manager who spoke to that issue that was part of our summary judgment briefing. So it is in your briefing in district court of what's confidential? It is, Your Honor. Can I proceed, Your Honor? You bet. Good morning, and may it please the court. My name is Ryan Ray. I have here with me co-counsel David Ross, and we represent the Appalese, Ace Alloys, and Michael Hooper. This court should affirm the district court's grant of summary judgment because, as Your Honor, the appeal here did nothing to distinguish the wheat from the chaff in this download. Instead, what it did for almost five years, in pursuit of very broad and very vague categorical description of certain types of information in this download, and what that allowed Double Eagle to do was to get very broad and almost unlimited discovery into every aspect of Ace Alloys' business. But I would submit the district court was entirely correct to say summary judgment was the stage in which that was no longer sufficient. Summary judgment was the time in which the claim trade secrets or confidential information had to be described with sufficient definiteness to allow the court to apply the criteria for protection and to determine the fact of a misappropriation. That's from the TLS case we cited. I believe it's quoting the restatement of unfair competition and a number of other cases. When you have these broad categorical descriptions that would essentially encompass the entirety of what Double Eagle does, that's not enough to do the things the district court identified, and those are not too high a standard for the very authority that I just cited. The court there says courts interpreting the Uniform Trade Secret Act, that's the law in Oklahoma, have uniformly followed this requirement. I just had a question about the specifications and how you apply that to the argument that you just made. So when Double Eagle says that all of our specifications that we give for a 718, for whatever it is, whatever PSQ, to TC, our machining company, all that's confidential. It doesn't matter what kind of product it is, when we tell our supplier what we want them to provide so that we can satisfy the entirety of our customers, irrespective of what type of product it is, why is it that you did not understand, I think I understand what they're talking about. That may or may not be a trade secret, but I certainly understand what they're talking about, and I don't know how it would be beneficial to say, well the 750 specification is confidential but the 718 is not. Why did you not understand that? What I would say to this, your honor, is the district court did talk about some, again specifications were described categorically, but the district court did say and talk about specifications and say that those are readily ascertainable by proper means in this case by anyone in this industry. And I think there's a few reasons that's true. Number one, as the courts noted, those are given to vendors in the industry. The information is ascertainable from customer specifications to some degree. Sorry, I don't want you to lose your train of thought. So you're saying that, well, let's say I want to enter this business, so I can go and figure out what every one of Double Eagle's customers are, I can go and ask for all of the customer drawings, assuming that they provide me 100% of their customer drawings, and then I could maybe employ an engineer like DEA presumably did to say, okay, for this proprietary range of alloy, for customers A, B, and C, and I can add those to the proprietary ranges for customers D, E, and F, and I can ultimately go through, I assume, maybe hundreds of thousands of dollars and figure out what it is that caused them to tell TC, just do this. That's a lot of work, assuming that all the customers provide it, and maybe that's not even confidential, but why isn't that sufficiently specific? A few things I'd say in response to that, Your Honor. I think one of the most significant ones is there was evidence in the record that these ranges that Your Honor is referring to are included with material test reports. All of the proprietary ranges were the MTSs? The ranges, the proprietary ranges that were identified in deposition by the corporate representative of Double Eagle is supposedly the most important, and this is really the proprietary information. Every bit of that is on material test reports. To the customer. Yes, that accompany these alloys. Double Eagle turns these loose in the marketplace, and when you receive it, you have to receive information that makes sure you're getting what the alloy is, and on that, we attach those in the record, it shows these exact ranges. Assuming I'm a customer and I provide the material test report. And there's evidence, Your Honor, that Ace Alloys had in fact purchased alloy that was from Double Eagle that had a Double Eagle material test report with it that revealed all of this information. It's in the marketplace and readily ascertainable by those in the industry by proper means by just buying the product. To some degree, these specifications, the information in them, it has to be there for the alloy to be the alloy that you're purchasing, and everyone in the industry knows what that alloy is, and then we have Double Eagle disclosing the specifications in the marketplace accompanying the products when they are released. So they were in fact ascertained by Ace Alloys through completely proper means. Is it your position then that these can't be trade secrets? The way that the customers and the manufacturers and so forth interact? I would say, Your Honor, that the information, if it is disclosed in the marketplace without limitation, especially in a sales business, that kind of information can't be a trade secret as a matter of law, and I think that's the core rule of this Court's decision in Sappington. So you need a confidentiality agreement at every step with every deal? I don't believe that's true, Your Honor, but if you choose to disclose certain information into the marketplace, into the stream of commerce, you've lost the ability to claim trade secret protection over that. Even if you have a confidentiality agreement? Well, and what I would say is as to most of the type of information we're talking about here, the District Court properly noted that there was no evidence in the record that there was a confidentiality agreement that prevented the disclosure of the types of things we're talking about. And what I think the District Court also properly recognizes, look, if there's 2,600 files here and all these things are described categorically, is it theoretically possible that something in some of it might meet the criteria? Perhaps so, but what you never had here was Double Eagle going down and specifying exactly what it was really at any point in time prior to the entry of judgment. And as to the issue, you know, they claimed on appeal that summary judgment was inter sua sponte, and frankly, that's just plainly not accurate, and I want to explain what really happened here. So in 2023, both parties moved for summary judgment. We responded to their motion and actually said and cited to the court the authority that says we're requesting that you enter summary judgment on some of the things we're saying in this response. And that was on file. They filed a reply brief to that. That was on file for close to a year. The court ended up below ordering some additional discovery. Those briefs were stricken, but very similar summary judgment briefs were filed in 2024. We made the very same argument. And so I think that was clear notice. But then Judge Russell on June 4th of last year entered a specific order, and he said I am considering granting summary judgment on several grounds, and one of them was that the confidential business information had not been described with sufficient deafness or enough particularity. And what they, really what Double Eagle said, and he gave them a chance to file a supplemental brief, and they could seek leave of court if they thought additional evidence was necessary. They didn't seek leave of court. They didn't suggest the need to further develop the claims. They didn't ask for leave to submit additional evidence. They didn't do any of that, and they didn't object to the procedure really at all. They essentially just said, well, summary judgment's not proper. And what they cannot do now on appeal is say, well, wait a minute. We really wanted to be able to further define this claim. We wanted to be able to submit further evidence in support of this claim. The time to do that was at the latest when the district court said, file supplemental briefs on that, and they didn't make those arguments. And we would submit that whether it's forfeiture or waiver, they've lost the opportunity to now claim on appeal that that procedure was somehow improper or that they really needed additional ability to pursue some part of that claim. But what we really had here is, yes, were categories of information described. And I think it's important to keep in mind there were significant amounts of things. Some of these exhibits in the summary judgment that were attached to their summary judgment briefing below, they were very 10, 12, 20, sometimes more pages that didn't necessarily always relate to each other. And now what they're wanting to say on appeal is, well, maybe there's one specific part of one of these documents that could perhaps constitute a trade secret. But they didn't make that specification below. Is that fair, Mr. Ray? You know, there were a lot of spreadsheets, and I have to admit, to understand it, my interpreter to understand it. But they were pretty specific, both in district court and us, about the pricing information, the specifications, which is categorical, as you mentioned, the customer drawings. I mean, a customer drawing is either a trade secret or it's not. If my customer drawing is a trade secret and Judge Seymour's does a customer drawing, I don't think anybody would say, well, one is a trade secret and one's not. So it's a category of customer drawings. They said all the customer drawings are trade secrets in district court. They said that the pricing information, not just the prices, but the way that they go about doing it, the costs of the products, the target margins, a variety of things that go into that, are the trade secret. And so why are we talking about the complexity, the volume of the documents? Because the documents are not the trade secrets. It's the categories of information. And that's what they say they identify to Judge Russell. And so I have been at least accepting the distinction between content and documents. Am I wrong about that? So let me respond to those in order, Your Honor. When we talk about pricing, they never identified in the district court with any kind of particularity that we have some kind of complex pricing algorithm. Why does it have to be complex? Well, because, as the case law recognizes, pricing-type information can rarely be a trade secret because of the fact that it is disclosed to customers. Oh, really? I'm 65. I've never had anybody tell me what their margins are. And so would you tell Double Eagle what your target margins are for every one of your customers? I don't believe any target margins were identified with any kind of particularity below. Well, that's what they said. All of the target margins are one of the five components that go into their pricing information. And so in addition, Your Honor, I respectfully maintain that they didn't identify target margins with particularity. But even if they had, the testimony below was that it's just a markup that's made based upon an assessment of market conditions. And someone that's participated in this industry simply knows what kind of markup the margin would bear, that the market would bear. So you don't mind providing your target margins to any of the suppliers? Well, the question is not whether our client would mind. The question is whether it qualifies for trade secret protection under the Trade Secret Act. But you're not arguing that your target margins are confidential? Our target margins aren't at issue in the case, Your Honor. We didn't bring any kind of a claim. But I would just, in closing, I would say that if knowledge of market conditions were sufficient to rise the level of a trade secret, it would essentially result in a lifetime non-competition agreement. And the Oklahoma case law is very clear, if I might just conclude my comment. You continue. And Robert, I wasn't paying enough attention to the clock. I cheated you out of time. So I'm going to give you an extra minute. No problem, Your Honor. Especially under Oklahoma law, where the case law is clear that an employee can use the general knowledge of the trades that they've acquired in a particular employer, and especially where Oklahoma says non-competition agreements for employees are never allowed under any circumstances. You can't allow these acts to be interpreted in a way that allows such broad categorical descriptions to essentially result in a lifetime embargo to change employers and do the same work. That's contrary to Oklahoma public policy, and the case law has consistently rejected it. Unless the court has any other questions? We might. Do you have any questions? Thank you, counsel. Thank you, Your Honor. Thank you, Your Honor. As part of my rebuttal, I would say that in terms of identification, ACE moved for summary judgment three times. Not once did they move on the basis of whether the trade secrets were properly identified. As to the proper identification. You were on fair notice about that. Pardon? It didn't come out of a blue sky. You were on fair notice. I'm just saying as evidence that they understood what we were talking about. They never moved on that issue, Your Honor. And to the issue about they didn't know what we were talking about, when I took their depositions, they all keep this same information secret. They keep it confidential. So to the question about whether they're going to disclose their margins, no, they're not. They protect that. And to the extent that Mr. Hooper has a general awareness of what the margins are in the industry, he has a specific awareness of Double Eagle's margins because he was our inside sales manager. In terms of whether this information is readily ascertainable, there's no evidence that any of this is readily ascertainable. Customer drawings. When Michael Hooper had an opportunity to quote one of our customers, he accessed the March 22 download to get the customer drawings that he needed in order to complete the quote. When one of the drawings wasn't available, he asked the customer if they would give it to him. And they said, no, we're not going to give it to you. And then he went to a machinist to get it that he knew that we used. And they broke a confidentiality agreement they had with us to give it to him. So when you obtain it by improper means, that's a long way from being readily ascertainable in the industry. And the same goes for our pricing. The components of our pricing, there's no evidence in the record that any of that is ascertainable. All of that is kept secret, and we take measures to ensure that. And that's the analysis that the court needs to apply is, what steps did we take to keep that information secret? Not whether, in some instance, it became public. Likewise with specifications, that's not readily ascertainable either. Mr. Ray referenced these MTRs. The MTRs give a testing result for that particular item. What the specification is is a range of items collected amongst our entire customer base. So you would have to obtain MTRs for a wide variety of customers in order to duplicate the specifications. The value of the specifications is we've developed a long history of a wide range of customers and compiled that into one document. So, again, not readily ascertainable. And I think there's a question as to our pricing. It does not need to be. I'll let you finish that thought. Thank you. The pricing, and we cited a case for the proposition, does not need to be complex. But it does need to hold the values of the trade secret. And those elements are kept secret under the provisions that the company employs. Okay. Thank you very much. This matter is submitted. I want to express appreciation. Both sides, your briefing and your arguments today were excellent. Thank you. This matter will be submitted.